William V. BRADLEY, individually and as President of International Longshoremen's Association (Independent), a duly organized labor union and unincorporated association of more than seven members, and James S. Castellano, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

WATERFRONT COMMISSION OF NEW YORK HARBOR, George Price Hays and Joseph Weintraub, as Commissioners for the States of New York and New Jersey, respectively, and as members of said Waterfront Commission of New York Harbor and Samuel M. Lane, Executive Director and General Counsel of said Waterfront Commission of New York Harbor, Defendants.

United States District Court,
S. D. New York.
April 4, 1955.

1. The matter was not brought on for argument before this Court until the afternoon of March 29, 1955.

Brenner, Hannan & Murphy, New York City, for plaintiffs, George A. Brenner, New York City, of counsel.

Samuel M. Lane, Gen. Counsel for the Waterfront Commission of New York Harbor, New York City, for defendants.

IRVING R. KAUFMAN, District Judge.

Once again, the federal courts are faced with a challenge to the constitutionality of the Waterfront Compact between the states of New York and New Jersey.[1] This is an action by William V. Bradley, individually and as President of the International Longshoremen's Association, on behalf of its members, and James S. Castellano to permanently enjoin the Waterfront Commission of New York Harbor from enforcing Articles IX and XII of the Compact and the Amendment to Regulation No. 7, promulgated pursuant to Article XII on March 17, 1955, effective April 1, 1955.

██ This Court, in a Memorandum dated March 31, 1955, 130 F.Supp. 303, denied plaintiffs' request for a temporary order restraining the enforcement of Articles IX and XII and the Amendment to Regulation No. 7. Plaintiffs now demand that the Court convene a Three-Judge Court pursuant to 28 U.S.C. §§ 2281 and 2284 because they ask for a permanent injunction on constitutional grounds against the enforcement of a state statute by a commission acting under the statute. 28 U.S.C. § 2281. Before this Court may properly convene a Three-Judge Court it must closely examine the complaint to determine wheth-

---

1. The Waterfront Compact was enacted into law by the Legislatures of New York and New Jersey on June 30, 1953, Laws of New York 1953, c. 882, McK.Unconsol. Laws, § 6700-aa et seq.; Laws of New Jersey 1953, cc. 202, 203, N.J.S.A. 32:-23–1 et seq., and approved by Congress on August 12, 1953, 67 Stat. 541.

er a substantial federal question is presented. "It is * * * the duty of a district judge, to whom an application for an injunction restraining the enforcement of a state statute or order is made, to scrutinize the bill of complaint to ascertain whether a substantial federal question is presented * * *." California Water Service Co. v. City of Redding, 1938, 304 U.S. 252, 254, 58 S. Ct. 865, 866, 82 L.Ed. 1323. If all the federal questions presented are insubstantial, and no basis for federal jurisdiction is alleged in the complaint other than such insubstantial federal questions, this Court is under a duty to dismiss the complaint for lack of jurisdiction over the subject matter. Ex parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152; California Water Service Co. v. City of Redding, 1938, 304 U.S. 252, 58 S.Ct. 865; O'Rourke v. Waterfront Comm., D.C.S.D.N.Y.1954, 118 F.Supp. 236; Robinette v. Chicago Land Clearance Comm., D.C.N.D.Ill. 1951, 115 F.Supp. 669; Poresky v. Ryan, 1 Cir., 1936, 82 F.2d 311. On the other hand, if there is any jurisdictional basis for the complaint this Court is under a duty to convene a Three-Judge Court, and it cannot dismiss the complaint on the merits. Stratton v. St. Louis Southwestern Ry. Co., 1930, 282 U.S. 10, 15, 51 S.Ct. 8, 75 L.Ed. 135; Webb v. State University of New York, D.C.S.D.N.Y.1954, 120 F.Supp. 554; cf. Ex parte Metropolitan Water Co. of West Virginia, 1911, 220 U.S. 539, 545, 31 S.Ct. 600, 55 L.Ed. 575; But see Ex parte Buder, 1926, 271 U.S. 461, 467, 46 S.Ct. 557, 70 L.Ed. 1036; Louisville & Nashville R. Co. v. Garrett, 1913, 231 U.S. 298, 304, 34 S.Ct. 48, 58 L.Ed. 229; Contra, Waddell v. Chicago Land Clearance Comm., 7 Cir., 1953, 206 F.2d 748.

Since jurisdiction based upon diversity of citizenship does not affirmatively appear on the face of the complaint, federal jurisdiction, if at all, must be predicated upon the existence of a substantial federal question.[2] "The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of [the Supreme] Court, as to foreclose the subject." California Water Service Co. v. City of Redding, supra, 304 U.S. at page 255, 58 S.Ct. at page 867.

As a consequence of these decisions, this Court must now determine at the threshold, whether the federal questions presented are substantial.

A brief sketch of the salient features of the Compact should aid in bringing into sharper focus the issues now before the Court. The Compact created the bi-state Waterfront Commission and granted to the Commission powers to license pier superintendents, hiring agents, port watchmen and stevedores and to register longshoremen for work on the waterfront. Effective power to prevent and cure deleterious waterfront conditions was lodged in the Commission by making the right to work on the New York waterfront conditional upon the possession of a license or registration card which could be denied by the Commission acting under specified standards of good character and work regularity. The Compact also sought, in Article XII, to eliminate the "shape-up" system of employing longshoremen by substituting for it a group of employment information centers as the exclusive agencies through which longshoremen could be hired.[3]

2. Broadside allegations of jurisdiction are made under the general federal question statute, 28 U.S.C. § 1331, and under most of the more specific types of federal question jurisdiction formulated in the Judicial Code. 28 U.S.C. § 1337 (civil action arising under a federal statute regulating commerce); Sec. 1343 (3) (civil action to redress state deprivation of a federal stat-

utory or constitutional right based upon equal protection); Sec. 1355 (action to enforce any federal statutory penalty or forfeiture).

3. "Dock workers are generally employed at a 'shape-up', a system that has always existed in the Port. Its most simplified form is as follows: When word goes out that dock workers are needed at a partic-

The Amendment to Regulation No. 7, promulgated by the Commission pursuant to Article XII, classifies dock workers on a tri-partite basis for the purposes of obtaining work through the employment information centers. Workers are classified as either "permanent" or "regular" employees according to the duration of their usual employment contract (i. e., daily or weekly basis) or, if numerous longshoremen are accustomed to working as a team, they may be classified as a "gang" upon a "regular" or "extra" basis.[4] The names of persons in the three main classifications are placed upon three "rosters" which are posted in the employment centers. An employer may place an employee's name, or an employee may place his own name, upon the relevant roster, providing that the worker is in possession of a registration card issued pursuant to the good character and regularity of employment standards of Articles VIII and IX. Daily or weekly hiring is effected, usually one day in advance of the work, by the employer's selection, through his licensed hiring agent, of men on the rosters of the employment information center. Any employee may remove his own name from a roster (or a majority of the members of a gang may remove the gang's listing) or the employer who originally listed the employee on the roster may remove the employee's name from the particular roster on which it was originally placed. Those placed on the "regular employee" roster must work at least twelve days a month to remain on this particular roster, unless the failure to work the required number of days was for "sufficient cause".

Article IX of the Compact is challenged here both upon its face, as construed, and "as applied" to the plaintiff Castellano. Article IX sets up the requirements of regularity of employment. Longshoremen who do not work or apply for work at an employment information center at least eight days in each month of a six month period are removed from the register, and, therefore, are ineligible for employment for a fixed time unless "good cause" is shown. The Commission, by regulation, fixed the eight-day rule pursuant to the standards in Article IX for establishing minimum working periods for continuance on the register:

"(a) To encourage as far as practicable the regularization of the employment of longshoremen;

"(b) To bring the number of eligible longshoremen more closely into balance with the demand for longshoremen's services within the port of New York district without reducing the number of eligible longshoremen below that necessary to meet the requirements of longshore-

---

ular pier, they form in a large semicircle around the hiring foreman. The hiring foreman then selects the men he wishes to hire and 'blows the whistle'. The men who are hired then file into the pier; those not hired drift away. The period for which the men are hired at the shape-up has changed over the years; today they are guaranteed four hours work. At each shape-up there is a new employment.

Variations of the shape-up are due largely to the fact that at some piers there is a fairly constant succession of vessels, while at the occasional piers the arrivals and sailings are irregular." Fourth Report, N.Y. State Crime Commission, (N.Y.Legis.Doc. No. 70, 1953), p. 37.

4. "At active piers there has developed the system of hiring the gang as a unit at the shape-up. The composition of the gang when this method is used is customarily determined by the gang boss and is normally a group accustomed to work together as a team. When a vessel arrives the hiring foreman determines how many gangs he will need and at the shape-up he then simply calls out a gang number or the name of the gang boss. At these piers there are the so-called 'regular' gangs who get first call, the regular extra gangs who get second call, and roving gangs who get what is left. Even at these piers, after the gangs have been hired at the shape-up, the 'extra labor', that is, longshoremen employed to carry passengers' baggage, shift cargo on the pier floor and clean up the pier, are still hired individually." Fourth Report, N. Y. State Crime Commission, (N.Y.Legis. Doc. No. 70, 1953), p. 37.

men in the port of New York district;

"(c) To eliminate oppressive and evil hiring practices affecting longshoremen and waterborne commerce in the port of New York district;

"(d) To eliminate unlawful practices injurious to waterfront labor; and

"(e) To establish hiring practices and conditions which will permit the termination of governmental regulation and intervention at the earliest opportunity."

■ The constitutional attack *upon the face of* Article IX and the eight-day requirement is completely without substance. Article IX has squarely been held constitutional, in the face of all the contentions now urged, by a Three-Judge Court consisting of the late Circuit Judge Augustus N. Hand, Judge McGohey and Judge Weinfeld in Linehan v. Waterfront Commission, D.C.S.D.N.Y. 1953, 116 F.Supp. 683. The case, on direct appeal to the United States Supreme Court, 347 U.S. 439, 74 S.Ct. 623, 98 L.Ed. 826, was affirmed without opinion by seven Justices for the majority. Justices Douglas and Black dissented on the ground that they thought substantial the very questions which the majority thought so frivolous that it rejected them without even dignifying them by a short majority opinion. These same contentions with respect to Article IX are once again urged here.

In Linehan, Judge Hand, in sustaining Article IX's conditioning of the right to work upon possession of a registration card which the Commission had the power to revoke for failure to work or apply for work for the fixed minimum number of days, said:

"The present system seems merely to cumber the waterfront with persons who have no substantial relation to the business of stevedoring and they would seem to be properly eliminated where their relation is so tenuous as not to fulfill the *extremely moderate requirements of the Act. The elimination of these fringe stevedores is immediately connected with the purpose of the Act since the crowding of the piers makes employment difficult and uncertain and is likely to lead to the abuses complained of.*" 116 F.Supp. at page 685. (Italics supplied.)

The standards in Article IX for determining the minimum working days upheld in Linehan against constitutional attack,[5] *"as construed"* currently by the Commission, to require eight days of work or application for work in each month for a period of six months, are clearly constitutional. The main bite of the eight-day rule—that a person *may lose the right to work* if he fails to work or apply for work for a minimum number of days to be fixed by the Commission under constitutionally definite standards set out in the Compact—was the very item sustained in Linehan. Is it not now frivolous to urge that defining a "fringe stevedore" to be one who works less than eight days a month is arbitrary and unreasonable?

Plaintiff Castellano admits, in the complaint, that he has in fact failed to meet the eight-day rule and alleges that he has been removed from the register. Castellano further alleges that he is an official of the International Longshoremen's Association, and that because of his duties with the union he could not work the required eight days.[6] No further allegations as to Castellano are made. Thus, the Court is asked to hold that the eight-day rule is unconstitutional when it is sought to be *"applied"* to this particu-

---

5. D.C.S.D.N.Y.1953, 116 F.Supp. 683, affirmed without opinion, 1954, 347 U.S. 439, 74 S.Ct. 623, 98 L.Ed. 826. The standards are quoted supra, Article IX (a)–(e).

6. It was urged on the argument by counsel for the Waterfront Commission that in fact Castellano has not been removed from the register and that Castellano is obviously confused in reading the notice as a notice of final removal. In the disposition of this application, however, I shall address myself to the face of the complaint.

lar individual, a union official. Since Linehan held that a fringe worker may constitutionally be eliminated from job competition with the regular worker, it is now frivolous to argue that one who is in fact a fringe worker because he devotes more than 22 days a month to union work is constitutionally protected. Surely, for purposes of illustration, it cannot be argued that some one who is occupied more than 22 days per month as an attorney would not be a fringe worker as a longshoreman if he chose to work the balance of the month as such. So, the mere circumstance that Castellano is a union official does not insulate him *constitutionally* from the operation of the registration provisions. The point here is that such a claim cannot rise to one of *constitutional* dimensions. If Castellano's claim is merely that the Commission in some way abused its discretion he may seek review of its action in the state courts under the express provisions of Article XI, subd. 7 of the Compact. Alabama Public Service Comm. v. Southern Ry. Co., 1951, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002; see Linehan, supra, 116 F.Supp. at page 684.

I shall now address myself to the attack upon Article XII. Article XII of the Compact provides in part:

> "No person shall * * * hire any person for work as a longshoreman or port watchman * * * except through [an] employment information center * * *. No person shall accept any employment as a longshoreman or port watchman * * * except through * * * an employment information center."

The quoted portion is the only operative provision of the Article. The residue grants the Commissioner the power to make rules thereunder, one of which, the Amendment to Regulation No. 7, is in issue here (hereinafter referred to as the "Amendment"). Both Article XII and the Amendment are attacked *on their face* as violations of the Due Process and Equal Protection clauses of the Constitution, as setting unconstitutionally vague standards, and as being inconsistent with the Taft-Hartley and Wagner Labor Relations Acts, 29 U.S. C.A. § 141 et seq. At the outset, it should be noted that these very same charges were levelled in other cases against Articles VIII and IX of the Compact (the registration provisions),[7] Article VII (prohibition of public loading)[8] and Article V (licensing of pier superintendents and hiring agents).[9] In each case, the contentions were roundly rejected by the Court; in some instances without discussion.[10]

The claimed unconstitutionality of Article XII and the Amendment under the Due Process Clause must be rejected because it is " 'obviously without merit' ".[11] The registration provisions of the Compact are the coercive portions of the Compact. They are the operative provisions for denying work to ineligible persons. Despite this, the registration provisions were upheld in Linehan. The main support for the constitutionality of the registration provisions was derived by the court in Linehan from the findings of the Legislatures of New York and New Jersey, contained in Article I of the Compact:

7. Linehan, supra.

8. Staten Island Loaders v. Waterfront Commission, D.C.S.D.N.Y.1953, 117 F. Supp. 308, 312, affirmed without opinion, 1954, 347 U.S. 439, 74 S.Ct. 623, 98 L. Ed. 826.

9. O'Rourke v. Waterfront Commission, D. C.S.D.N.Y.1954, 118 F.Supp. 236. Judge Weinfeld dismissed the complaint for want of a substantial federal question.

10. "The plaintiffs have made other charges of unconstitutionality but they are so lacking in substance that we think they need not be discussed." Staten Island Loaders v. Waterfront Commission, supra [117 F.Supp. 311].
"Since we hold the Act is within the police power of the State, the numerous objections to it generally based on violations of the Constitution would all seem to be without foundation." Linehan, supra, 116 F.Supp. at page 685.

11. Ex parte Poresky, supra [290 U.S. 30, 54 S.Ct. 4].

"1. The states of New York and New Jersey hereby find and declare that the conditions under which waterfront labor is employed within the port of New York district are depressing and degrading to such labor, *resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices* and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees; * * *." (Italics supplied.)

Section 1 of Article XII contains these findings:

"The states of New York and New Jersey hereby find and declare that the method of employment of longshoremen and port watchmen in the port of New York district, commonly known as the 'shape-up', has resulted in vicious and notorious abuses, of which such employees have been the principal victims. There is compelling evidence that the 'shape-up' has permitted and encouraged extortion from employees as the price of securing or retaining employment and has subjected such employees to threats of violence, unwilling joinder in unauthorized labor disturbances and criminal activities on the waterfront. The 'shape-up' has thus resulted in a loss of fundamental rights and liberties of labor, has impaired the economic stability of the port of New York district and weakened law enforcement therein. It is the sense of the legislatures of the states of New York and New Jersey that these practices and conditions must be eliminated to prevent grave injury to the welfare of waterfront laborers and of the people at large and that the elimination of the 'shape-up' and the establishment of a system of employment information centers are necessary to a solution of these public problems."

The inter-relationship between the registration provisions on the one hand and Article XII and the Amendment on the other hand now becomes clear. Ineligibility to work is created and enforced by the constitutionally sanctioned registration provisions not by the employment information provisions of Article XII and the Amendment. The latter two provisions merely create the agency through which those rendered eligible under the registration system may seek employment from day to day. The employment center merely channels requests to employ by the employers and requests to be employed by the eligible employees. There are no coercive provisions in either Article XII or the Amendment. They merely insure the existence of those economic conditions which prevail in other industries—i. e., the right of the employer to select employees of his own choosing and the right of employees to freely accept or reject offers of employment. The middleman —the employment information center— merely classifies by means of the rosters the respective offers and acceptances. The Commissioner's functions of selectivity occur at the registration level; the only selectivity at the employment center level is that of the employer and employee. What Article XII and the Amendment really accomplish is to substitute the employment information center system of hiring for the old hiring foreman or "shape-up" system with its intimate connection with criminality. It is crystal clear from the foregoing, that any attack upon Article XII and the Amendment is " 'obviously without merit' ", and contrary to the precedents cited.

The Fourth Report of the New York State Crime Commission (May 20, 1953) (New York Legislative Document No. 70), which is part of the legislative history of the Compact, points up the evils

of the "shape-up" with astonishing directness and factual accuracy. The Crime Commission stated (pp. 37–44):

"The hiring foreman has complete control over what method shall be used at the shape-up and who shall be employed. There is no seniority; an individual or gang may have worked for years at a particular pier and yet can be refused employment at any time, with casuals getting the work.

\* \* \* \* \* \*

"Thus the shape-up, as now operated, has produced a large surplus of casual longshoremen.

"Walter P. Hedden, Director of Port Development of the Port of New York Authority, testified that the shape-up system was directly responsible for many of the illegal activities and work stoppages which diverted trade from the Port. Thus:

" 'There are many aspects of the shape-up which lead to friction in connection with the utilization of piers; specifically, the hiring is usually done by a hiring boss, who, while not only responsible to management, is actually an approved selectee of the union, and generally of those people who control that particular pier; hence the struggle to obtain control of the pier through the hiring boss has led in many cases to a great deal of friction, strikes, work stoppages, and other matters which have been very bad from the standpoint of the Port of New York.

\* \* \* \* \* \*

" 'The outstanding thing about the present system is that the ability of a man to get a job on that particular dock depends almost entirely on his ability to persuade the hiring boss to give him that job, which puts him pretty much at the mercy of the hiring boss in the form of whatever corrupt hiring practices the hiring boss may indulge in, such as kickbacks, connections that are used, facilities of his friends and what-not.

" 'As a result, there has been a great deal of resentment—dissatisfaction on the part of the men themselves towards this system and it has undoubtedly led to a situation where the pilferage, the corruption in connection with hiring, and the other things which have been a matter of testimony before your Commission, are closely associated with the method of hiring.' "

\* \* \* \* \* \*

"Under the shape-up the hiring foreman holds the key position on the pier, and has the absolute right to use any method he desires and to employ anyone he wishes. The right, therefore, to select and control the hiring foreman is of vital importance to all concerned.

"For the average longshoreman the hiring foreman determines whether the longshoreman and his family shall have the necessities of life. For the employer the hiring foreman symbolizes that all-important factor of pier operation, namely 'time'.

\* \* \* \* \* \*

"In almost every instance the selection of the hiring foreman was dictated by ILA officials.

\* \* \* \* \* \*

"The record gives examples of assault, organized theft, pilferage, extortion, kickbacks, loan-sharking, gambling, payroll padding, other criminal activities and even murder, which can be attributed to the present shape-up and hiring foreman system \* \* \*. The murders of hiring foreman Thomas Collentine, Barney Dietz, Anthony Hintz, Nuncio Alluotto and, most recently, that of Francis Kelly fall into this category.

\* \* \* \* \* \*

"It should be emphasized, however, that mere elimination of the shape-up will accomplish nothing whatsoever. If only this were done, the existing abuses would readily

attach themselves to any substitute hiring system. The shape-up must be replaced by a comprehensive program which would not only get rid of the undesirable hiring foremen, but also exclude the other abuses recounted in this Report."

In the light of all this, it is preposterous to suggest that the legislatures of two states, with the consent of Congress, were arbitrary and unreasonable in selecting employment centers for hiring purposes in place of the "shape-up" system.

The language of Article XII and the Amendment [12] is as constitutionally definite as that contained in Articles VIII and IX which were sustained against vagueness and delegation of legislative power contentions.

"In answer to the argument that it furnishes no standard of conduct for the Waterfront Commission to apply, it seems reasonable to hold, in view of the particularity with which the purposes of the Act are expressed, the context in which the clause appears, and the fact that this is a civil and not a criminal statute, that the standard is not too vague." Linehan, supra, 116 F. Supp. at page 684.

 The tri-partite classification of workers in the Amendment does not discriminate in violation of the Equal Protection Clause. The "gang" classification is clearly reasonable and in fact accords with custom on the waterfront.[13] The "permanent" and "regular" employee classifications based upon probable duration of employment certainly have a rational basis, being analogous to the constitutionally valid "regular" and "casual" classifications based upon duration of employment in the registration

provisions of Article IX. Linehan v. Waterfront Commission, supra. Moreover, the same unsavory conditions which led to the constitutionally valid total prohibition of the public loading system under Article VII, Staten Island Loaders v. Waterfront Commission, D.C.S.D. N.Y.1953, 117 F.Supp. 308, affirmed per curiam without opinion, 1954, 347 U.S. 439, 74 S.Ct. 623, 98 L.Ed. 826, support the elimination of the shape-up system.

 The last contention of the plaintiffs is that Article XII and the Amendment conflict with the Wagner and Taft-Hartley labor legislation of the federal government, and that therefore the former are inoperative under the Supremacy Clause. A contention that a state statute, otherwise valid, is inoperative because it is in conflict with a valid federal statute, does not per se constitute a challenge "upon the ground of the unconstitutionality of such statute" within the provision requiring a single District Judge to convene a Three-Judge District Court. 28 U.S.C. § 2281; Case v. Bowles, 1946, 327 U.S. 92, 97, 66 S.Ct. 438, 90 L.Ed. 552; Ex parte Bransford, 1940, 310 U.S. 354, 358, 60 S.Ct. 947, 84 L.Ed. 1249; Pennsylvania Greyhound Lines v. Board of Public Utility Com'rs, D.C.D.N. J.1952, 107 F.Supp. 521, 525. However, if the Supremacy claim is substantial enough to support federal jurisdiction in the first instance,[14] it might be argued that the other constitutional claims, though insubstantial, would have to be heard before a Three-Judge Court since a single District Judge can only dismiss for want of jurisdiction. See cases cited, supra, page 3. Whether this proposition is correct is immaterial in the instant case because the Court is of the view that the Supremacy claim is insubstan-

---

12. The main attack of the plaintiffs is directed to those portions of the Amendment which lodge some discretionary powers in the Commission [e. g., its power to remove persons from the roster].

13. See footnote [4].

14. The claim would have jurisdictional support as "arising under any Act of Con-

gress regulating commerce" [The Taft-Hartley and Wagner Acts] within the meaning of 28 U.S.C. § 1337. A. F. of L. v. Watson, 1946, 327 U.S. 582, 591, 66 S.Ct. 761, 90 L.Ed. 873; Capital Service, Inc., v. N. L. R. B., 1954, 347 U.S. 501, 504, 74 S.Ct. 699, 98 L.Ed. 887.

tial. It is to be noted that the very same claims of Supremacy, stated as such or in the guise of a "pre-emption" contention, were made in the Linehan and Staten Island Loaders cases.[15] Moreover, both Article XII and the Amendment *on their face* do not in anyway conflict with rights secured by collective bargaining or the rights of employees to lawfully pursue certain concerted activities enumerated in federal labor legislation. Again, it is emphasized that the employment information center is merely a conduit for processing the requests of employers and the acceptances of registered employees for employment. The employment center does not insulate the employer or the employee from sanctions for unfair labor practices nor does Article XII or the Amendment attempt to parallel or to oppose any of the exclusive remedies provided under federal labor legislation.[16] The Amendment itself in Section 7.12 states:

"It shall be the policy of the Commission to grant to representatives of the union permission to have such access at hiring hours for the purpose of observing compliance with any legal collective bargaining agreement regulating hiring practices, providing that a signed memorandum is filed with the Commission setting forth in detail the agreed basis for hiring." See also Article XV.[17]

██ Upon the grounds herein set forth, the Court is of the opinion that the federal questions presented are insubstantial and, therefore, on the defendants' motion, which has been presented to this Court in conjunction with plaintiffs' motion to convene a Three-Judge Court, the complaint must be dismissed for lack of jurisdiction over the subject matter. Fed.Rules Civ.Proc., rule 12(b) (1), 28 U.S.C.A.

In arriving at this conclusion I realize that it would be far simpler to order a Three-Judge Court and permit that Court to rule on the very questions herein disposed of by one Judge. But, to do so would be to shirk the responsibility placed squarely on the shoulders of the District Judge by the line of authorities cited previously.

So ordered.

---

15. See plaintiffs': Supreme Court Brief in Linehan, p. 23 (dated Jan. 6, 1954); Trial Brief in Linehan, Point XIV. (Civ. Action 88–254) (dated October 27, 1953); Trial Brief in Staten Island Loaders, p. 7 (dated November 25, 1953) (Civ.Action 88–91).

16. See Weber v. Anheuser-Busch, Inc., 75 S.Ct. 480.

17. Any speculative or imaginative conflict which now exists between the Associa-

tion's collective bargaining agreement with its "customs and practices" clause and the employment information center system had best be postponed for the purposes of judicial determination to the time, if ever, that such a conflict becomes imminent or actual. In this connection, it may be noted that the classification of a gang as "regular" or "extra" is made to depend upon "the definition contained in the current collective bargaining agreement." Amendment, Sec. 7.5(c) (2).